UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TERRI JONES,

       Plaintiff,

                                     Case No. 1:22-cv-604

v.

                                     Hon. Hala Y. Jarbou

WAL-MART STORES, INC., et al.,

       Defendants.

_____/

## OPINION

       Plaintiff Terri Jones worked for Defendant Walmart, Inc. (formerly Wal-Mart-Stores, Inc.) from June 2018 until May 26, 2019, after which she took a medical leave of absence.  She contends that she faced a hostile work environment at Walmart, and that it discriminated against her on the basis of sex and retaliated against her for complaining about harassment, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) et seq., and Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 et seq.  She brought this action against Walmart and some of the employees with whom she worked:  Kandis Ellis, Laura Evans, Michael Goffnet, Thomas Kjellin, Ashley Langerak (formerly Ashley Hankiewicz), and Alex Zock.  Before the Court is Defendants' motion for summary judgment (ECF No. 47).  For the reasons herein, the Court will grant the motion in part and deny it in part.

## I. BACKGROUND

### A. Jones's Position at Walmart

       Jones started working as a cashier at a Walmart store in Comstock Park, Michigan, on June 6, 2018.  (Jones Dep. 100, ECF No. 53-2.)  In October 2018, she was promoted to the position of customer host, also known as "asset protection host" or "greeter." (*Id.* at 115.)  The latter position

required her to greet customers as they entered the front doors of the store and check customer receipts as they left the store.  (*Id.* at 126, 205-06.)

### B. Harassment

Jones claims that she experienced sexual harassment from three employees at the store, beginning in October 2018.

#### 1. Zock

Defendant Zock worked with Jones as a customer host from October 2018 to March 2019. (Jones Dep. 201.)  Jones claims that, beginning in October 2018, Zock sang popular songs with "sexually suggestive" lyrics in her presence, such as "I Want to Sex You Up" and "Sexual Healing," as well as "tropical songs about him being on an island and . . . using coconuts for boobs[.]"  (*Id.* at 141, 200.)  Sometimes he did so while dancing or rubbing his belly just underneath his belt. (*Id.* at 41-42.)  She repeatedly told him to stop, but he would not do so.  Once, he rolled his eyes and made a sexual gesture, pretending to pull a butt toward his crotch while saying to Jones, "[S]he says that I am out of my mind.  I think she wants me to hit it from behind." (*Id.* at 142-43.)  He directed lewd songs at her "about three times."  (*Id.* at 141.)  She reported these incidents to her supervisor, Defendant Evans.

Zock would also comment on female customers' body parts in Jones's presence, such as referring to a customer's "big tits" or "big behind."  (*Id.* at 147.)  His comments were "so constant" that Jones did not report everything he said, but she did complain to Evans "every time" he made comments about women, sang sexual songs, or made "sexual suggestions with his body parts." (*Id.* at 168-69, 201.)  In all, she complained about Zock's conduct "up to 15 to 20 times" from October 2018 to March 2019.  (*Id.* at 201, 248.)  Jones contends that Evans simply brushed off these complaints and did nothing, saying, "[O]h, he's so crazy . . . he's nuts."  (*Id.* at 201-02.) After Zock learned that Jones had reported him, he told her, "I'm going to have to give you a

spanking" and then continued his conduct.  (*Id.* at 201.)  Finally, in March 2019, Zock asked Jones to "grab his nuts" while gesturing toward his crotch.  (*Id.* at 147.)  When she refused, he said, "Why not?  They're right there on the shelf."  (*Id.*)  According to Jones, "he was actually talking about his snack that was on the . . . shelf."  (*Id.*)  She complained about this to Evans.  (*Id.* at 172.)  She also submitted a complaint to Walmart's "ethics" department on April 15, 2019, reporting that Zock "is . . . always singing lewd songs about 'how he wants to rub his body against you' and has even implied sodomy with [Jones]."  (Investigations Email, ECF No. 48-5, PageID.519.)

Evans claims that she learned about Zock's inappropriate singing from the ethics department in April 2019.  (Evans Dep. 59, ECF No. 53-14.)  She contends that she gave Zock "verbal coaching," but the coaching does not appear in his personnel file.  (*Id.* at 58.)

When Defendant Goffnet, the store manager, interviewed Jones in June 2019 about other harassment complaints she made, he learned about her allegation that Zock had been "dancing lewdly."  (Goffnet Dep. 80-82, ECF No. 53-11.)  He then interviewed Zock, who provided a written statement.  (*Id.* at 82.)  In his statement, Zock denied "mentioning or saying anything inappropriate" to Jones.  (6/11/2019 Zock Statement, ECF No. 53-26, PageID.992.)  Zock received no discipline following Goffnet's investigation.  (Goffnet Dep. 25.)

### 2. Kjellin

Defendant Kjellin worked "front-end maintenance" at the Walmart store; he encountered Jones frequently while she worked as a cashier and a customer host.  (Kjellin Dep. 23, ECF No. 53-16.)  Jones contends that he harassed her on several occasions.

First, at the end of January 2019, while Jones was checking customer receipts by the doors, Kjellin came up to her from behind, put his hands on her shoulder, and pressed his body against hers for a few seconds in such a way that she could feel that he had a partial erection.  (Jones

Dep. 127-29.)  She told him to get off her and then complained about it to Jessica, a front-end manager.  (*Id.* at 130-31.)

Next, about a week later, Kjellin approached her from behind, put his hands on her, and caressed her shoulder while blowing on the back of her neck.  (*Id.* at 41, 132, 243.)  She complained about this incident to two customer service managers.  (*Id.* at 244-45.)

Then, on February 24, 2019, while she was eating lunch with an assistant store manager, Nick Krave, Kjellin touched her shoulder with his hands.  (*Id.* at 135, 160, 209.)  She then submitted a written statement regarding the three incidents to Krave and Defendant Langerak.  (*Id.* at 136, 151; *see* Walmart Global Ethics Statement Form, ECF No. 53-3.)  Langerak was an assistant manager and was Kjellin's direct supervisor.  (Langerak Dep. 64, ECF No. 53-12.)  Kjellin was told to stay away from Jones.  (Kjellin Dep. 38, ECF No. 53-16.)  Krave asked Jones if she was comfortable returning to work, and Jones said that she was, so long as they moved her to a different location, away from where Kjellin worked.  (Jones Dep. 136-37.)  Krave agreed to do that.  (*Id.* at 137.)

Later that day, however, Kjellin approached Jones with his palms out, saying, "Terri, Terri, I just want to talk to you, I'm sorry."  (*Id.* at 207, 209.)  She immediately called Krave and then he and other managers came and escorted Kjellin away.  (*Id.* at 208.)

Kjellin did not touch Jones again after February 24, 2019.  (*Id.* at 137.)  But she mentioned all his physical contacts with her in her April 15, 2019, complaint to Walmart's corporate ethics committee.  (Jones Dep. 123-24.)  And although he did not touch her again, Jones claims that he would give her "dirty looks" and glare at her.  (*Id.* at 250-51.)  In May 2019, she reported this to Pam, a customer service manager, who did nothing about it.  (*Id.* at 251.)  When Evans, Jones's supervisor, learned about the issue, she offered Jones the opportunity to move to a different set of

doors, away from Kjellin.  (Evans Dep. 68.)  Jones refused.  (*Id.*)  Evans also contends that she reviewed store video of Kjellin and Jones from February because Jones had reported that Kjellin was walking by her and making her uncomfortable.  Evans claims she did not see any intimidating conduct in the video.  (Evans Dep. 14, 18-19, 21.)

Defendant Goffnet, the store manager, learned about Jones's allegations against Kjellin in April 2019 through Jones's April 15, 2019, ethics complaint, but he did not investigate them until June 2019 (as discussed below, from April 12 to May 21, 2019, and after May 26, 2019, Jones was on leave of absence).  (Goffnet Dep. 46, 66, ECF No. 53-11.)  As part of that investigation, he interviewed Jones and Kjellin.  (*Id.* at 69-70, 78.)  Kjellin gave a statement to Goffnet in which he admitted that he had touched Jones on several occasions.  (*Id.* at 23.)  According to Kjellin's statement, he gave Jones a "friendly hug" because she told him that she was "having a bad day[.]" (6/7/2019 Kjellin Statement, ECF No. 53-6, PageID.802.)  Kjellin also admitted that he touched her on two other occasions: he squeezed her on the shoulder in one instance and he touched her on the shoulder when she was sitting at Subway.  (*Id.*)  Finally, he admitted that he was told to stay away from her, but nevertheless he approached her and tried to apologize.  (*Id.*)

Goffnet reported the results of his investigation to the ethics committee at Walmart, which recommended "yellow coaching," a "write-up," for Kjellin due to lack of "respect for the individual."  (Goffnet Dep. 24-25; *see* 6/11/2019 Frick Email, ECF No. 48-15.)

### 3. Griesa

Brian Griesa was another one of Jones's co-workers at Walmart.  (Jones Dep. 173.)  Jones contends that, on May 26, 2019, Griesa approached her, rubbed her back, dragged his fingers down her back and bottom, and told her, "I'm so glad you're here."  (*Id.* at 43-44, 173-74, 176.)  She turned around and told him that she would "break his neck" if he ever touched her again.  (*Id.* at

176.)  She told managers about the incident, including Mark Southard, who told her to take time off and go home.  (*Id.* at 44-45.)

On June 4, 2019, Goffnet interviewed Jones about Griesa's conduct and asked her to make a statement.  (Goffnet Dep. 9, 69-70.)  Evans claims that she and Goffnet also watched store video of the incident; they saw Griesa touch Jones's back "for a split second" and then walk away.  (Evans Dep. 17.)  Goffnet took notes of their observations from the video and sent them to Melisa Frick, an ethics manager at Walmart's corporate office.  (Goffnet Dep. 87; 6/11/2019 Goffnet Email, ECF No. 48-14; *see* Frick Dep. 10-13, ECF No. 53-20 (describing her position).)

In addition, Krave, an assistant store manager, prepared a statement describing Jones's complaint to him about Griesa's conduct.   (6/11/2019 Krave Statement, ECF No. 48-21, PageID.626.)  According to Krave's statement, he reviewed video of the incident and saw Griesa "gently place his open hand on [Jones's] back, say something and walk away."  (*Id.*)  Krave also spoke to Griesa, who claimed he put his hand on Jones's back and said, "Glad to have you back." (*Id.*)  According to Griesa, Jones said that if he ever touches her again, she would "rip his Fxxxxxg head off."  (*Id.*)

Frick recommended that Griesa receive a reprimand for touching Jones.  (6/11/2019 Frick Email, PageID.590.)  Frick also recommended a reprimand for Jones for reportedly telling Griesa that she would "rip his F head off."  (*Id.*)

Jones contends that Griesa also told her that his father was racist and that "black women are for prostitution."  (Jones Dep. 177-78.)  She reported these comments to several managers, including Pam and Goffnet.  (*Id.* at 255.)  Apparently, no action was taken in response to these complaints.

### C. Demotion

Jones was demoted back to her cashier role, effective April 13, 2019. (*Id.* at 204-05; Job Offer – Hourly, ECF No. 53-23.) The cashier role paid a lower hourly rate than the customer host role. (Job Offer – Hourly, PageID.981.) She contends that she received the demotion because of her February 24, 2019, complaint about Kjellin's conduct. (Jones Dep. 205.) She also blames the demotion on an incident in which she encountered an "irate couple with loads of merchandise on their cart" while she was working as a greeter. (*Id.*) After Jones asked to check their receipt, they became "hostile," so she called a customer service manager to "take over the situation[.]" (*Id.* at 206.) The manager told her to "take a break" and to "go to the back," but later she received coaching from Langerak for "leaving [her] post." (*Id.* at 206, 252.) At that point, her managers told her to return to her cashier role. (*Id.* at 206.)

### D. Leaves of Absence

Jones requested a medical leave of absence starting April 12, 2019, with an expected return on May 21, 2019. (*Id.* at 114, 121.) Walmart approved her request. She returned to work on May 22 through May 26, 2019. (*Id.* at 121-22.) May 26—the day Griesa touched her back—was her last day at Walmart. She requested another leave of absence after May 26, 2019. (*Id.* at 193.) Walmart approved that request. In July that year, a nurse practitioner who had been treating Jones since October 2018 opined that Jones could not return to work because of "delusions and hallucinations. She is easily irritated/agitated." (Medical Rep., ECF No. 48-8, PageID.549.) Jones continued on leave until she was approved for disability in March 2020 due to manic bipolar disorder and post-traumatic stress disorder. (Jones Dep. 22, 197.)

## II.  PROCEDURAL HISTORY

Jones initially filed her complaint in Kent County Circuit Court. After she amended her complaint to add claims under Title VII, Walmart removed the action to this Court.

In Count I of her amended complaint, Jones asserts that Defendants are liable under the ELCRA because she suffered a hostile work environment due to her sex.  In Count II, she contends that Defendants discriminated against her on account of her sex, in violation of the ELCRA.  In Count III, she claims that Defendants retaliated against her for complaining about sexual harassment, in violation of the ELCRA, by disciplining her and "forc[ing] her to resign from her position with Defendants."  (1st Am. Compl. ¶ 48, ECF No. 8.)

Counts IV, VII, and VIII[1] allege parallel claims under Title VII against the corporate defendants.  In other words, Jones claims that Defendants Walmart, Inc., and Wal-Mart Stores East, LP, are liable under Title VII for the hostile work environment she faced, for discrimination on account of her sex, and for retaliation.

Defendants move for summary judgment on all counts.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  Summary judgment is not an opportunity for the Court to resolve factual disputes.  *Id.* at 249.  The Court "must shy away from weighing the evidence and instead view all the facts in the light most favorable to the nonmoving party and draw all justifiable inferences in their favor." *Wyatt v. Nissan N. Am., Inc.*, 999 F.3d 400, 410 (6th Cir. 2021).

---

[1] The amended complaint does not contain Counts V or VI.

8

# IV. ANALYSIS

## A. Hostile Work Environment

"A work environment is actionable under Title VII if the workplace is 'permeated with discriminatory intimidation, ridicule or insult sufficiently severe or pervasive to alter the conditions of employment.'" *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (quoting *Hawkins v. Anheuser–Busch, Inc.,* 517 F.3d 321, 333 (6th Cir. 2008) (internal quotation marks omitted)). "Michigan courts interpret the ELCRA using Title VII case law. And, for purposes of [a] hostile work environment claim, the legal standards are the same." *Garcia v. Beaumont Health Royal Oak Hosp.*, No. 22-1186, 2022 WL 5434558, at *3 (6th Cir. Oct. 7, 2022) (citing *Wasek v. Arrow Energy Servs., Inc.*, 682 F.3d 463, 468 (6th Cir. 2012)).

Jones must establish that

> (1) she belonged to a protected group, (2) she was subject to unwelcome harassment, (3) the harassment was based on [sex], (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment, and (5) the defendant knew or should have known about the harassment and failed to act.

*Waldo*, 762 F.3d at 813 (quoting *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011)).

### 1. Severe or Pervasive Harassment

Defendants argue that Jones's evidence does not suffice to establish that any harassment she faced was sufficiently severe or pervasive to create an abusive working environment. To succeed on this element, "the conduct must be severe *or* pervasive enough to create an environment that a reasonable person would find hostile or abusive and the victim must subjectively regard that environment as abusive." *Hunter v. Gen. Motors, LLC*, 807 F. App'x 540, 545 (6th Cir. 2020) (quoting *Wharf v. U.S. Dep't of Veterans Affs.*, 713 F.3d 874, 878 (6th Cir. 2013) (emphasis added; quotations marks omitted)). The Court must "consider the totality of the circumstances in assessing objective severity or pervasiveness and look to the following factors for guidance: 'the

frequency of the discriminatory conduct; its severity; whether it [was] physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfere[d] with an employee's performance.'" *Id.* (quoting *Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 733 (6th Cir. 2006)). In addition, the Court must consider all the incidents together when conducting its analysis. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999). The Court cannot disaggregate incidents "based on the identity of the harasser[.]" *Id.* "[E]ven where individual instances of sexual harassment do not on their own create a hostile environment, the accumulated effect of such incidents may result in a Title VII violation." *Id.* at 563.

Generally, "'offhand comments' and 'isolated incidents' do not suffice" to create a hostile work environment. *Hunter*, 807 F. App'x at 545 (quoting *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 515 (6th Cir. 2009)). *Cf. Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 708, 715 (6th Cir. 2007) (finding that fifteen incidents of "offensive utterances" over a two-year period were not severe or pervasive) *with Williams*, 187 F.3d at 563 (finding harassment to be severe or pervasive when there were more than a dozen incidents, many of which involved aggressive behavior, over a period of one year). Sixth Circuit precedent sets "a relatively high bar for what amounts to actionable discriminatory conduct under a hostile work environment theory." *Hunter*, 807 F. App'x at 545 (quoting *Phillips v. UAW Int'l*, 854 F.3d 323, 328 (6th Cir. 2017)). "[W]hether harassment was so severe and pervasive as to constitute a hostile work environment [is] 'quintessentially a question of fact.'" *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 310 (6th Cir. 2016) (quoting *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006)).

Here, Jones testified that, over the course of six months from October 2018 to March 2019, Zock repeatedly sang lewd songs (three of which he directed at her), he made a sexual gesture toward her while saying "she wants me to hit it from behind," he pointed to his genitals while

10

asking her to grab his "nuts," and he made regular comments about the body parts of female customers.  In addition, Kjellin touched her three times over the course of a few weeks in February 2019.  Two of Kjellin's touches were relatively intimate.  One involved pressing his body and genitals against her for a few seconds.  Another involved caressing her shoulder while standing close to her and breathing on her neck.  During his third and last touching incident, he briefly put his hands on her shoulder.  He did not touch her again after that day, but he occasionally glared at her or gave her mean looks.  Finally, on May 26, 2019, Griesa dragged his fingers over Jones, rubbing her back and bottom.

Jones argues that she suffered daily harassment from Zock, which made the harassment pervasive.  Her testimony does not quite support this assertion.  She did not testify that Zock's conduct or comments occurred on a daily basis.  Instead, she testified that his comments and lewd songs were "constant."  She provided more detail when testifying that she reported Zock's conduct to Evans "constantly, every time it happened," "every single time," for a total of "up to 15 or 20 times between October and March."  (Jones Dep. 169, 200-01, 248.)  Similarly, she testified that Kjellin's behavior in "coming up from behind" her was "constant" when it occurred four times over as many weeks.  (*Id.* at 132.)  Construing the evidence in Jones's favor, Zock's lewd songs and sexual comments were a frequent, at least weekly, occurrence, which does not make them so pervasive or severe *on their own* as to create an abusive working environment.  Many of his comments were not directed at her.  She testified that he directed three lewd songs at her, and she identified only a few instances in which he made inappropriate remarks or gestures toward her.  Singing offensive songs and making inappropriate comments *about others* has less impact.  *See Black v. Zaring Homes, Inc.*, 804 F.3d 822, 825 (6th Cir. 1997) ("While . . . sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII, . . . most of the

comments [here] were not directed at plaintiff; this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment."). "The standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)).

On the other hand, when aggregating Zock's conduct with the unwanted touching and other conduct by Kjellin and Griesa, Jones has presented enough evidence to proceed to a jury. Defendants argue otherwise, relying on *Hensman v. City of Riverview*, 316 F. App'x 412, 413 (6th Cir. 2009). There, the plaintiff failed to demonstrate a hostile work environment when, over the course of only six weeks, her supervisor

> 1) hugged her three times; 2) twice made comments to her about being "voluptuous"; 3) said he was not listening to her because he was distracted by her beauty; 4) walked too closely behind her; 5) closed the door when he met with her in his office; 6) told her she looked cute in her pajamas [after showing up at her house late at night]; 7) brought her flowers and bagels to apologize for disturbing her the previous night; 8) complimented her perfume [and continuously "sniffed" her]; 9) called her by the wrong name; and 10) grabbed her by the arm when she tried to leave.

*Id.* at 417. "Even considering all of the[se] allegations as sexual," the plaintiff failed to show that they created a hostile work environment. *Id.* The "most disturbing instances"—"the comments about [the plaintiff's] voluptuousness and the unwanted physical contact"—"were not frequent." *Id.* at 417. And although the supervisor's comments and other actions were more frequent, they did not "'permeate[] the workplace with 'discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

In comparison to the comments in *Hensman*, Zock's comments were more frequent. In addition, at least two of the instances of touching by Kjellin and Griesa were more overtly sexual

than the hugs in *Hensman*.  In that case, the court noted that the defendant never "grabbed" the plaintiff "sexually." *Id.* at 417.  By contrast, Kjellin purportedly leaned into Jones enough that she could feel a partial erection.  Also, Jones claims that Griesa's fingers rubbed her butt.  Although the touches by Kjellin and Griesa were brief and were not "sustained or physically restraining," *cf. Ault v. Oberlin Coll.*, 620 F. App'x 395, 403 (6th Cir. 2015) (concluding that physical contact was "especially severe" because the plaintiff's supervisor pressed his body against her from behind such that she could feel his penis and because he positioned his body to prevent her from escaping and "failed to relent, despite repeated requests"), when aggregated with Zock's persistent commentary and sexual songs, there is sufficient evidence for a jury to find that Jones faced a hostile work environment.

Defendants also rely on *Bowman v. Shawnee State University*, 220 F.3d 456 (6th Cir. 2000), in which the plaintiff accused his supervisor of the following conduct over the course of four years: rubbing his shoulder for "approximately one to two seconds"; putting her hands on him and pushing him toward a door; twice suggesting that he should use her home whirlpool (once inviting him to come on his own and once suggesting that he use it with her); and grabbing his buttocks then saying that "she controlled [his] ass and she would do whatever she wanted with it." *Id.* at 458-59.  *Bowman* "may set the outer limits on what conduct a reasonable person could not believe creates a hostile work environment." *Nathan v. Great Lakes Water Authority*, 992 F.3d 557, 569 (6th Cir. 2021).  Although it is a close call, that case is distinguishable from this one because the harassing conduct Jones faced, particularly from Zock, was more frequent and more pervasive than any conduct in *Bowman*.

Jones's case is more similar to *Abeita v. TransAmerica Mailings*, 159 F.3d 246 (6th Cir. 1998), in which the plaintiff asserted that sexually offensive statements by her supervisor, the

president of the company, were "continuous," "commonplace," and "ongoing" over a period of seven years; those statements included many remarks about his sexual interest in other female employees and models, as well as statements that reflected "degrading gender stereotyping." *Id.* at 249.  For example, he "remarked that a female employee's weight was extreme and that the overweight female employee could iron clothes the company sent to customers by just sitting on the full boxes." *Id.*  He directed only one remark at the plaintiff herself, saying, "yellow dress and yellow shoes, yellow underwear too?" *Id.* at 148.  The Court of Appeals concluded that this evidence was sufficient for the case to proceed to the jury.  Similarly, Jones regularly heard sexual statements and commentary about other women for an extended period of time.  Combined with the instances of unwanted and intimate touching by Kjellin and Griesa—a more invasive form of harassment that was not present in *Abeita*—a reasonable jury could find the existence of a hostile work environment in Jones's case.

On the one hand, *Abeita* is distinguishable in that none of Jones's harassers were her supervisors.  In that case, the court emphasized that the harasser was the president of the company and the plaintiff's supervisor, with whom the plaintiff worked on a daily basis.  *Id.* at 252. Harassing conduct by a supervisor and company president is arguably more threatening than harassment by a co-worker because a supervisor has more control over the plaintiff's working conditions and terms of employment.  Also, a supervisor can create space for additional harassment by other employees by expanding the boundaries of what is tolerated.

On the other hand, Jones testified that her supervisors effectively condoned some of the harassment she faced from her coworkers.  She contends that she repeatedly complained about the harassing conduct to her managers and was met with delayed action, inaction, or even tacit approval.  For instance, Jones claims that Evans regarded Zock's conduct as funny and did nothing

14

about it.  The Court of Appeals gives "more weight . . . to acts committed by a serial harasser" because such a harasser, if "left free to harass again[,] leaves the impression that acts of harassment are tolerated at the workplace[.]"  *Hawkins*, 517 F.3d at 337.  Similarly, the repeated conduct by Zock and Kjellin, coupled with inaction by Jones's managers in response to her complaints, deserves some additional weight.  And like the harassment by the company president and supervisor in *Abeita*, a jury could conclude that the harassment from Zock had more impact, in part, because Evans, Jones's supervisor, expressly indicated that she tolerated it.

In sum, the Court is not persuaded that Jones failed to present sufficient evidence of a hostile work environment.

### 2. Remedial Measures (Employer Liability under the ELCRA and Title VII)

Defendants Walmart, Goffnet, Langerak, Ellis, and Evans also argue that they are not liable for a hostile work environment because they took prompt and adequate remedial measures after Jones complained about harassment.  Under the ELCRA, the employer is liable for a hostile work environment "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action."  *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005). Actual notice is not necessary; "the test is whether the employer knew or should have known of the harassment."  *Id.*

"The employee can demonstrate that the employer knew of the harassment by showing that she complained to higher management of the harassment . . . or by showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Sheridan v. Forest Hills Pub. Schs.*, 637 N.W.2d 536, 542 (Mich. Ct. App. 2001) (quoting *McCarthy v. State Farm Ins. Co.*, 428 N.W.2d 692, 695 (Mich. Ct. App. 1988)).  Higher management is "someone in the employer's chain of command who possesses the ability to exercise significant influence in the decision-making process of hiring, firing, and disciplining the

15

offensive employee." *Id.* at 543.  In other words, it is someone who has "actual authority to effectuate change in the workplace." *Id.*

Similarly, under Title VII, the plaintiff "must show that the employer's response to the plaintiff's complaints 'manifest[ed] indifference or unreasonableness in light of the facts the employer knew or should have known.'" *Waldo*, 726 F.3d at 814 (quoting *Hawkins*, 517 F.3d at 338).  In other words, the plaintiff must show that "the employer 'knew or should have known of the harassment' and 'failed to take prompt and corrective action.'" *Smith*, 813 F.3d at 311 (quoting *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005)).

Generally, an adequate response under Title VII is one that is "reasonably calculated to end the harassment." *Jackson v. Quanex Corp.*, 191 F.3d 647, 663 (6th Cir. 1999).  "Steps that would 'establish a base level of reasonably appropriate corrective action' may include promptly initiating an investigation . . . , 'speaking with the specific individuals identified . . . , following up with [the complainant] regarding whether the harassment was continuing, and reporting the harassment to others in management.'" *Waldo*, 726 F.3d at 814 (quoting *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 633 (6th Cir. 2010)).

In their briefing, Defendants focus on remedial actions taken by Walmart managers on or after February 24, 2019.  They do not address the lack of action taken in response to Jones's complaints about Zock from October 2018 to March 2019.  Jones says she repeatedly reported his behavior to Evans and other managers throughout that time period, and no action was taken.  In addition, as Jones points out, Goffnet did not investigate her April 2019 complaint until June of that year.[2]  Thus, a question of fact remains as to whether Defendants took prompt and appropriate action in light of the facts that they knew or should have known.

---

[2] Goffnet testified that he was trained to interview the victim first when starting an investigation.  (Goffnet Dep. 66-68.)  He implied that he did not interview Jones immediately because she was on medical leave, though he

**B. Sex Discrimination**

Jones also claims that Defendants discriminated against her on account of her sex.  Because Jones offers no direct evidence of sex discrimination, the Court examines her claim through the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under that framework, Jones must establish a prima facie case of discrimination by showing

> (1) she is a member of a protected group; (2) she was subjected to an adverse employment decision; (3) she was qualified for the position; and (4) . . . similarly situated non-protected employees were treated more favorably.

*Drerup v. NetJets Aviation Inc.*, No. 22-3475, 2023 WL 4204551, at *6 (6th Cir. June 27, 2023) (quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 776 (6th Cir. 2016)); *see Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 521-22 (Mich. 2001) (applying *McDonnell Douglas* standard to an ELCRA discrimination claim).

Defendants argue that Jones has not demonstrated that Defendants took an adverse action or that Defendants treated her differently on account of her gender.  As adverse actions, Jones identifies her demotion, the "coaching" she received from Langerak, and the "constructive discharge" she faced "as a result of the constant and unaddressed sexual harassment she endured." (Pl.'s Resp. Br. 28, ECF No. 53.)

As to the demotion and the coaching that Jones received, no evidence indicates that either of these actions were motivated by Jones's gender.  Among other things, Jones does not identify any similarly-situated employees who were treated more favorably than her.

As to the constructive discharge, "[a]n employee is constructively discharged when 1) her employer deliberately created working conditions so intolerable or difficult that a reasonable person in her shoes would feel compelled to resign, and 2) the employer did so with the intention

---

acknowledged that he could have called her at home.  (*Id.* at 67.)  His explanation, and the reasonableness of that explanation, are questions of fact for the jury to decide.

of forcing the employee's resignation." *Garcia*, 2022 WL 5434558, at *7. "The Court examines the working conditions through an objective lens, . . . asking whether . . . a reasonable person would feel such compulsion." *Id.* The standard for a constructive discharge is higher than what is required to demonstrate a hostile work environment. *McDaniel v. Wilkie*, No. 19-3304, 2020 WL 1066007, at *4 (6th Cir. Jan. 31, 2020) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). Jones has not met that standard.

As of Jones's last day of work on May 26, 2019, she was not working directly with Zock and she had not experienced any physical contact from Kjellin in about two months. In fact, on February 24, 2019, she had told her managers that she was comfortable returning to work despite Kjellin's conduct. What apparently prompted her need to take another medical leave of absence was the touch she received from Griesa on May 26, which Defendants investigated not long thereafter. Considering all the circumstances, Jones's conditions were not so intolerable or difficult that a reasonable person would feel compelled to resign. In addition, Jones has not shown that her employer intentionally created conditions that would force her to resign.

In short, Jones has not provided sufficient evidence to support a sex discrimination claim.

### C. Retaliation

Jones also claims that Defendants retaliated against her. Because Jones offers no direct evidence of retaliation, the Court applies the *McDonnell Douglas* framework. Jones must establish a prima facie case of retaliation by showing

> (1) she engaged in activity protected by [Title VII or the ELCRA], (2) the exercise of her [protected conduct] was known to [Defendant], (3) [Defendant] then took an adverse employment action against her, and (4) there was a causal connection between her protected activity and the adverse action.

*Kirkland v. City of Maryville*, 54 F.4th 901, 910 (6th Cir. 2022). If she makes that showing, the burden shifts to Defendants to "articulate a legitimate, nonretaliatory reason for the adverse

action."  *Id.*  At that point, the burden returns to Jones, "who must demonstrate that [Defendants']

proffered justification was pretextual."  *Id.*

Defendants argue that Jones has not shown a causal connection between an adverse action

and any protected conduct.

### 1. Protected Conduct

Jones's complaints about harassment by her coworkers are protected conduct.

### 2. Adverse Actions

Jones relies upon the coaching, the demotion, and the constructive discharge as the adverse

actions.  For reasons discussed above, she has not established a constructive discharge, so the Court

will consider the other two actions as the basis for her retaliation claim.

Defendants argue that the coaching Jones received is not an adverse action in itself.  *See*

*Sensabaugh v. Halliburton*, 937 F.3d 621, 629 (6th Cir. 2019) (letter of reprimand coupled with

suspension with pay is not an adverse action); *Taylor v. Geithner*, 703 F.3d 328, 338 (6th Cir.

2013) ("A written reprimand, without evidence that it led to a materially adverse consequence such

as lowered pay, demotion, suspension, or the like, is not a materially adverse employment action."

(quoting *Creggett v. Jefferson Cnty. Bd. of Educ.*, 491 F. App'x 561, 566 (6th Cir. 2012)).  Jones

does not argue otherwise.  Instead, she apparently argues that coaching *plus* demotion is an adverse

action.  The Court agrees that coaching itself is not an adverse action; however, coaching

accompanied by a demotion is an adverse action for purposes of a retaliation claim.

### 3. Causal Connection

For causation, Jones relies primarily on the temporal proximity between her written

complaint of harassment on February 24, 2019, and her coaching and demotion on or about April

13, 2019.  (Pl.'s Resp. Br. 31.)  Temporal proximity can be sufficient to establish causation in

some circumstances, but it is not sufficient here.  As the Court of Appeals has explained:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.  But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008).  The Court of Appeals has "made clear that a plaintiff can avoid summary judgment based on temporally proximity alone only in rare cases."  *Rudd v. City of Norton Shores*, No. 22-1229, 2023 WL 3886404, at *9 (6th Cir. June 8, 2023) (citing *Lemaster v. Lawrence Cnty.*, 65 F.4th 302, 310 (6th Cir. 2023); *Sensabaugh*, 937 F.3d at 630); *see also Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 660 (Mich. 2005) ("[I]n order to show causation in a retaliatory discrimination case [under the ELCRA], '[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.'" (quoting *West v. Gen. Motors Corp.*, 665 N.W.2d 468, 473 (Mich. 2003))).  This is not one of those rare cases.

Jones's focus on the proximity between her February 24 report and her demotion ignores her history of complaints about harassment at Walmart.  For months, she repeatedly complained to Evans and other managers about harassment by Zock.  And Jones acknowledges that Langerak, who gave Jones the coaching reprimand, was aware of Jones's harassment complaints as early as October 2018.  (Pl.'s Resp. Br. 29.)  Yet during the next six months, Jones suffered no meaningful consequences for making those complaints.  That time period during which she repeatedly complained about harassment without consequence undermines an inference of a causal connection between her February 24, 2019, complaint and any adverse action taken by Langerak and other managers in April 2019.  *Cf. Coleman v. Bowerman*, 474 F. App'x 435, 438 (6th Cir. 2012) (holding that temporal proximity alone was not sufficient for a "prolific [prison] grievance

filer" to demonstrate a retaliation claim because "any attempt at enforcing prison regulations would likely be in 'close temporal proximity' to one of [his] many grievances or grievance interviews").

Thus, to establish a causal connection, Jones must provide some "other evidence" suggesting that her coaching and demotion were acts of retaliation for her protected conduct. *See Mickey*, 516 F.3d at 525. She has not done so. Accordingly, construing the facts in the light most favorable to Jones, her retaliation claim fails for lack of evidence. She has not provided evidence to support a reasonable inference that there was a causal connection between her protected conduct and her coaching and demotion.

In passing, Jones argues that "the rationale for [her] demotion, i.e., her interactions with customers, is unsupported and expressly denied by [her]." (Pl.'s Resp. Br. 31.) It is not clear what she means by this statement or how it supports her claim. She apparently refers to the incident in which she encountered "a very irate couple" with "loads of merchandise on their card" who became "hostile" after she asked them for a receipt. (Jones Dep. 205-06.) This incident occurred when Jones was "just signing on, going to the door to cover the door." (*Id.* at 206-07.) She called a customer service manager to "take over the situation"; he did and then told Jones to "take your break, go to the back." (*Id.* at 206.) She followed this advice; she took a break and then "went to the back." (*Id.*) Later that day, she received coaching from Langerak for leaving her post. (*Id.*) Even though she left her work area, she contends (without explanation) that she did not leave her post. (*Id.*)

Jones does not explain how the foregoing evidence supports her claim that the coaching or demotion were motivated by her harassment complaints. Indeed, her testimony does not demonstrate that Walmart's rationale for the coaching or demotion was unsupported, let alone that "retaliation was the real reason for the adverse action." *Tingle v. Arbors at Hilliard*, 692 F.3d 523,

530 (6th Cir. 2012).  While Jones testified that Defendants "retaliated against" her by demoting her to the cashier position (Jones Dep. 205), her personal opinion about Defendants' motives does not add support to her claim.  Accordingly, her retaliation claim fails.

**D. Individual Liability under the ELCRA – Defendants Zock & Kjellin**

Defendants Zock and Kjellin argue that they are not liable under the ELCRA.[3]  That statute makes an "employer" liable, and it defines the term employer to include "agents" of the employer.  *See Elezovic v. Bennett (After Remand)*, 73 N.W.2d 452, 457 (Mich. Ct. App. 2007).  The Michigan Court of Appeals has interpreted the term "agents" in the ELCRA to refer to "persons to whom the employing agency delegates supervisory power and authority over subordinates," "as distinguished from coemployees, subordinates, or coworkers who do not have supervisory powers or authority[.]"  *Id.* at 458.  Here, there is no evidence that Zock or Kjellin were given supervisory power or authority by Walmart.  Thus, Jones cannot assert a claim against them under the ELCRA and they will be dismissed.

## V. CONCLUSION

In summary, the Court will grant Walmart's motion in part and deny it in part.  Jones has not presented sufficient evidence to support her claims of discrimination and retaliation, so the Court will dismiss those claims.  Also, Jones cannot assert a claim under the ELCRA against Defendants Zock or Kjellin.  Because that is the only claim against them, the Court will dismiss them as defendants.  However, Jones's claims against the remaining defendants regarding a hostile work environment can proceed under the ELCRA and Title VII.

---

[3] Jones does not assert Title VII claims against the individual employee defendants.  *See Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 406 (6th Cir. 1997) ("Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII.").

22

The Court will enter an order in accordance with this Opinion.


Dated: January 23, 2024                          /s/ Hala Y. Jarbou
                                                 HALA Y. JARBOU
                                                 CHIEF UNITED STATES DISTRICT JUDGE